**S. AMANDA MARSHALL, OSB # 95347**
United States Attorney
District of Oregon
**DAVID L. ATKINSON, OSB # 75021**
Assistant United States Attorney
david.atkinson@usdoj.gov
**CHARLES F. GORDER, JR., OSB  # 91287**
Assistant United States Attorney
charles.gorder@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Attorneys for United States of America


## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:10-CR-00506-KI |
| v. | **GOVERNMENT'S**<br>**TRIAL MEMORANDUM** |
| **HOSSEIN LAHIJI,**<br>        and<br>**NAJMEH VAHID,**<br>        a.k.a. Najmeh Lahiji, | |
| Defendants**.** | |

The United States of America, by S. Amanda Marshall, United States Attorney for the

District of Oregon, through Charles F. Gorder, Jr. and David L. Atkinson, Assistant United

States Attorneys, submits its trial memorandum in connection with the jury trial scheduled for

June 4, 2013, at 9:00 a.m.

### FACTUAL BACKGROUND

Defendant Hossein Lahiji is a medical doctor who resides in McAllen, Texas.  Defendant

Najmeh Vahid is married to defendant Lahiji and during the relevant time period of this case was

the manager of defendant Lahiji's medical offices in Texas.  Both defendants immigrated to the United States from Iran and have family who remain in Iran.

Despite the fact that defendant Lahiji has earned millions of dollars in his medical practice in Texas,[1] he has expressed to several persons his dislike for the United States.  For example, in September 2001 after the terrorist attacks in New York, Washington, and Pennsylvania, he told people that the United States got what it deserved.  In 2003, he told one of his employees, Yolanda Westerman, that he was only in this country to make as much money as he could and then he would retire in Iran.  But the defendants had a problem in getting their money back to Iran.

### The Iranian Embargo

From 1995 through 1997, President Clinton imposed a series of financial prohibitions, culminating in regulations called the "Iranian sanctions" or the "Iranian Embargo" which prohibit almost all trade and financial transactions with Iran or with persons in Iran.  These sanctions have been maintained, with minor variations, by Presidents Bush and Obama ever since then.

To implement the embargo, the Treasury Department's Office of Foreign Assets Control ("OFAC") issued the Iranian Transactions Regulations codified at 31 C.F.R. § 560.101, *et seq.* The regulations prohibit United States persons such as the defendants from engaging in any transaction related to the sale or supply of goods or services to or in Iran unless authorized by the issuance of a license by the Treasury Department through OFAC.  Unless a license is obtained, the regulations prohibit United States persons from (among other things):  (1) engaging in a transaction that evades or avoids, or has the purpose of evading or avoiding, the Iranian Embargo

---

[1]  Although not part of the charges in this case, the defendants have been indicted in the Southern District of Texas for, *inter alia*, fraud in defendant Lahiji's medical practice.  Their trial in that District is currently scheduled to occur in October 2013.

**Government's Trial Memorandum**                                              **Page 2**

(31 C.F.R. § 560.203); (2) engaging in or facilitating any transaction related to goods or services of Iranian origin (31 C.F.R. § 560.206); and (3) making any new investment in Iran (31 C.F.R. § 560.207). The regulations do allow a U.S. person to send a remittance to a family member in Iran, as long as the remittance is not related to an underlying commercial transaction which would be otherwise prohibited, such as a family-owned enterprise.

As a result of the Iranian sanctions, banks in the United States were reluctant to wire-transfer money to Iran. Defendants never contacted OFAC or applied for a license to send money to Iran. Rather, defendants tried several different methods to evade the Iranian sanctions and move their money to Iran, including wiring funds to third parties in other countries and covertly shipping U.S. currency directly to Iran. And they also discovered the Child Foundation here in Portland, Oregon.

## Background of the Child Foundation

In 1994-1995, Mehrdad Yasrebi had formed the Child Foundation (hereafter "CF US") as a non-profit Oregon corporation and obtained tax-exempt status for it from the Internal Revenue Service. The ostensible purpose of CF US was to raise money in the United States to support deserving children throughout the world. Yasrebi later wrote that its purpose was to assist in the "holy duties to educate and prepare the children for the Islamic Republic [of Iran]." Iran is a state sponsor of terrorism with a theocratic government run by radical Islamic clerics under the leadership of its "supreme leader," Ayatollah Khamenei. Thus, Yasrebi noted that his proposal was "suitable for Muslims who support the revolution" and he consulted with a number of Iranian officials during the formation of CF US, including Ayatollah Makarem Shirazi, a high-ranking radical member of the clerical establishment in Iran who carries out the work of Ayatollah Khamenei.

**Government's Trial Memorandum**                                                    **Page 3**

Yasrebi, through the assistance of his parents and his cousin, fugitive co-defendant Ahmad Iranshahi, established an affiliate in Iran called "Refah Kudak."  Yasrebi wrote to the "religious brothers in charge of the office of education" in Iran, noting that "if the Hezb[ullah] brothers support the Child Foundation in Iran," it would easily support children.  Yasrebi, Iranshahi, CF US, and Refah Kudak are all co-conspirators in this prosecution.

### The Defendants' Use of the Child Foundation

At some point, defendants Lahiji and Vahid became aware of the existence of CF US. CF US became a vehicle for the defendants to launder their money back to Iran and to invest it there without detection by US authorities.  From 1998 through 2007, the defendants sent approximately $1.9 million to the Child Foundation here in Portland.  Using a variety of methods, Yasrebi transferred the defendants' funds to Iran.  Most of this money was used for the personal benefit of the defendants in violation of the Iranian Embargo, including (1) to purchase a building in Tehran, using the name of defendant Lahiji's sister, for approximately $250,000.00, (2) to deposit  $700,000.00 for the defendants at an Iranian bank which paid 20.5 percent interest per year, (3) to pay about one-half million dollars in "khoms," or religious taxes, on defendants' behalf to Ayatollah Makarem Shirazi, and (4) to install defendant Vahid's mother as the salaried head of a Refah Kudak branch office in Iran.

Yasrebi and CF US gave the defendants receipts which allowed them to deduct these illegal investments in Iran as purported "charitable deductions" to CF US from their gross income, thus substantially lowering the income tax which they owed to the United States. Occasionally, the defendants backdated their checks (and CF US backdated its receipts) so defendants could deduct the purported contribution a year earlier than they should have, even assuming that the payment had been for a legitimate charitable contribution.

**Government's Trial Memorandum**                                                     **Page 4**

The government will prove its case through a combination of witness testimony, documents and electronic evidence seized during the execution of search warrants, intercepted electronic communications, and the testimony of several expert witnesses.  The government will not seek to introduce into evidence any currently classified information.

### The Purchase of a Building in Iran

In the summer of 2000, CF US's newsletter published an article written by co-defendant Iranshahi indicating that there was an urgent need for office space in Tehran and asking for a donation.

By late 1999, the defendants had sent a $200,000 check and then a $75,000 check to CF US.  Yasrebi wire-transferred $275,000 to one Mohsen Hashemi in Dubai, United Arab Emirates ("U.A.E."), in January 2000, after he deposited the defendants' $75,000 check.  In September 2000, another $400,000 check was sent by defendants to CF US.  Yasrebi wired this money to the Ras Khaimah Exchange in Dubai, U.A.E in October 2000.  Some part of these funds totaling $675,000 were used to purchase a building in Tehran (often referred to as the "Tehran House") for $250,000 for the defendants but in the name of defendant Lahiji's sister after the $250,000 was given to one Mr. Badihi, defendant Lahiji's brother-in-law.  The defendants agreed to allow Refah Kudak to use part of the building for office space for a ten-year period, when possession of the building would revert to them.  Part of the building's space was also rented out.  The defendants deducted the money used to buy the building, which now belonged to them, as a charitable contribution on their income tax return.

Refah Kudak's internal records reflected the defendants' ownership of the Tehran building.  For example, an email sent to co-defendant Iranshahi from a Refah Kudak employee in November 2005 contained an "Account Summary for Mr. Lahiji."  This summary stated the

$250,000 had been used to purchase the house in October 2000 and indicated it was available "until the end of 1389 [March 2001]."

Nevertheless, Yasrebi falsely told the first outside CF US accountant, Ron Chatterton, that CF US owned this building in Tehran and had purchased it with a $245,000 loan from the defendant Lahiji.  Therefore, when Chatterton prepared CF US's 1999-2000 IRS Information Return (hereafter referred to as an "IRS Form 990") he listed the building as an asset of CF US and listed a $245,000 loan from defendant Lahiji as a purported liability.  A few years later, a new accountant hired by CF US, Jonathan Resnick, was told by Yasrebi and other CF employees that the building did not belong to CF US and was only on loan for ten years.  Consequently, Resnick removed the reference to the building and the false loan from CF US's later IRS Form 990s.

### The Iranian Bank Deposits

In April 2002, Iranshahi proposed to Yasrebi that they suggest placing defendant Lahiji's money in the Karafarin Bank in Iran which offered long term deposits paying approximately 20 percent per annum.  Sometime during 2002 or early 2003, defendant Lahiji wrote to Ayatollah Hossein Mazaheri, the head of the seminary in Isfahan, the hometown of the defendants. Ayatollah Mazaheri is a pro-Iranian government ayatollah who oversees some of Ayatollah Khamenei's (the supreme leader's) organizations in the province of Isfahan.  Defendant Lahiji's letter in part stated:

> I . . . intend to make a long term investment in one of the Islamic Republic's banks.  Would you please write whether this act, from religious laws point of view, is lawful or forbidden?

Ayatollah Mazaheri responded in writing "[i]n the name of God, it is very good and sound."

**Government's Trial Memorandum**                                                    **Page 6**

Shortly thereafter, defendant Vahid signed a backdated check (dated December 18, 2002) drawn on the account of Lahiji Urology Centers for $350,000 and sent it to CF US.  Although the check was deposited in CF US's account on March 10, 2003, a receipt dated December 25, 2002, was issued by CF US and sent to the defendants, who later deducted this $350,000 as a charitable deduction on their 2002 (not their 2003) tax return.  The CF US wired the $350,000 to its affiliate in Switzerland on April 30, 2003, and the Swiss affiliate then wire-transferred the money to Refah Kudak in Iran on May 5, 2003.  Refah Kudak opened up an account on behalf of the defendants at the Bank Karafarin in Iran.  This account was described in Refah Kudak's audited financial statement for May 31, 2003, as a "long-term, (five years) deposit" made in accordance with an agreement with defendant Lahiji.

Later that year, in July 2003, defendant Lahiji sent a second $350,000 check to CF US which deposited the check in its bank account on July 30, 2003.  CF US issued a receipt for this $350,000 dated July 29, 2003.  The defendants deducted this $350,000 as a charitable contribution on their 2003 income tax return.  The money remained in the CF US bank account until March 15, 2004, when it was wire-transferred to Switzerland and from there transferred to Refah Kudak in Iran three days later.  Refah Kudak once again put this money in the Karafarin bank on behalf of the defendants.

As with the purchase of defendants' building, Refah Kudak's internal records reflected the defendants' ownership of these funds.  The email sent to co-defendant Iranshahi from a Refah Kudak employee in November 2005 containing an "Account Summary for Mr. Lahiji" listed $350,000 in cash in May-June 2003 with the notation "Until Khodad 1387 [May 2008].  The summary also listed $350,000 in cash in April-May 2004 with the notation "Until Ordibehesht 1388 [April 2009]."

**Government's Trial Memorandum**                                                                 **Page 7**

In 2006, Refah Kudak apparently experienced cash flow problems and co-defendant Iranshahi took some money out of the defendants' Karafarin Bank account, without obtaining the defendants' permission.  This unauthorized withdrawal was discovered by Refah Kudak's auditors who were preparing the financial statement for 2005-2006, and who threatened to reveal the unauthorized withdrawal as part of the audit.  The FBI intercepted phone conversations between Yasrebi and Iranshahi which indicated that the auditors demanded that Refah Kudak show that it had defendant Lahiji's permission to take this money out of his account.  Iranshahi prepared a letter to that effect and sent it to defendant Lahiji requesting that he retroactively approve the withdrawal.

On November 27, 2006, defendant Vahid called Yasrebi who explained that Refah Kudak had "borrowed" some of the defendants' money from the account without their permission.  In an intercepted phone call which will be played for the jury Yasrebi told defendant Vahid:

> this account of yours Mrs. Lahiji...we...last year we had shortage in budget...50 thousand Tomans...or I think 50 million Tomans or 50 thousand dollars something like this...we borrowed from your CD account.  We borrowed and then put it back.  It means your account did not change, but since this has been taken and put back...the accountants want you or someone who owns the account to okay it.

The following day, Yasrebi told defendant Vahid, "your money ... there is a contract they sign with Doctor [Lahiji] and the Child Foundation in Iran that they leave this money in the account for 4-5 years...okay, this is a certificate of deposit and you are legally the owner of the account...now the Child Foundation is not authorized to touch this money unless you grant permission."

**Government's Trial Memorandum** **Page 8**

Defendant Lahiji eventually agreed to sign the letter giving Refah Kudak his approval for temporarily taking the money out of his account.  Defendant Vahid faxed the approval letter to co-defendant Iranshahi and Yasrebi on November 28, 2006.

**Payment of "Khoms" to Ayatollah Shirazi**

An expert on Iran will testify about the practice of paying religious taxes, or "khoms," by followers of the Shiite branch of Islam that is the official religion in Iran.  In summary, a worshipper following the Shiite tradition is subject to paying a tax on one-fifth of his unused annual income to a particular ayatollah that he follows.  Wealthy followers are often allowed by an ayatollah to spend part of the "khoms" paid to the ayatollah on something upon which both parties agree.  The defendants apparently "followed" radical Ayatollah Makarem Shirazi and paid their khoms to him.

The defendants used CF US to funnel between $500,000 and $550,000 in "khoms" to Ayatollah Shirazi, while taking inappropriate "charitable contribution" deductions for these payments off their U.S. income tax liability.  Indeed, the first substantial payment the defendants made to CF US came in the form of a $100,000 check that was sent to CF US by Federal Express on January 29, 1999, and deposited in the CF US bank account on February 1, 1999.  That check, however, was backdated to December 31, 1998, and CF US issued a backdated receipt.  The defendants then deducted the $100,000 as a charitable contribution on their 1998 income tax return (not on their 1999 return).  A notation on the check in Farsi indicated "Khoms-Zakat."  In Yasrebi's check register he noted that he sent "Dr. Lahiji's money through a money exchanger." CF US bank records indicate that the defendant's money was wired in August 1999 to Al Ektasad United Company in Kuwait.

Emails between Refah Kudak personnel, Iranshahi, and Yasrebi in November 2005 contained an internal accounting record of another $875,000 which the defendants had sent to Iran through CF US in 1999 and 2000. The Refah Kudak accounting indicated that $250,000 was paid in "khoms" in February-March 2003 and used for a complex in Shiraz, Iran and Foundation expenses. In September 2006, Yasrebi emailed Iranshahi and indicated that the actual figure was $200,000, not $250,000, "which [defendant Lahiji] has paid for Khoms in the past and you gave that to Ayatollah Makarem."

And finally in March 2006, the defendants sent another $200,000 check (backdated to 2005) to CF US for "khoms." In several communications, the defendants requested that CF US provide a receipt from Ayatollah Shirazi for this last payment. In an intercepted phone call on January 22, 2007, Iranshahi requested that Yasrebi send him $320,000 via Damavand, a commodities broker in Dubai, U.A.E., because "I have not yet paid Mr. Lahiji's Khoms which I had to." Three days later, Yasrebi wired $320,000 to the account of Damavand.

### Funding for Defendant Vahid's Mother

In late 2007, the defendants proposed to CF US and Refah Kudak that they open a branch office of Refah Kudak in Isfahan, the defendants' family hometown and a city where defendant Vahid's mother, Ms. Anvari, resided. The defendants proposed to partly fund the office, but also wanted Ms. Anvari made the salaried head of the office. There was some disagreement between the parties about how the money would flow to Isfahan, but ultimately an office was opened and Anvari was placed in charge. In May 2008, the defendants sent CF US a $20,000 check to fund activity at the Isfahan office. A year later, Iranshahi received complaints that Ms. Anvari was using Refah Kudak funds for her personal benefit.

/ / /

**Government's Trial Memorandum**                                                    **Page 10**

**The Defendants' Own Accounting for Their Investments Through 2006**

When the defendants learned that Iranshahi and Refah Kudak had taken money out of the defendants' Karafarin Bank account without permission, they understandably became concerned. Defendant Vahid produced her own accounting of payments made to CF US and moneys belonging to defendants. She faxed a chart on this subject to Iranshahi and Yasrebi on November 27, 2006. The chart covered $1.775 million sent by defendants from 1999 through 2006, that is, all of their substantial transfers made up to that date, except the first $100,000 which had been sent as "khoms" in early 1999.

Defendant Vahid's chart listed the "status" of the accounts as of November 27, 2006:

(1) $250,000 for the purchase of the "Tehran House" which was said to be "due" in the Persian month corresponding September-October 2010;

(2) $250,000 in "khoms" paid;

(3) another $200,000 in "khoms" for which a receipt was still pending;

(4) $350,000 in a joint account for a period of 5 years which was listed as being "due back" in the Persian month corresponding to April-May 2008; and

(5) actually $67,000 in charity work which they had approved in 2005.

Defendant Vahid requested that Yasrebi and Iranshahi verify this information and provide "bank statements for the joint account." Her chart did not discuss or describe the second $350,000 for the Karafarin Bank account.

At some point, co-defendant Iranshahi handwrote on a copy of defendant Vahid's chart that he approved the status. On February 13, 2008, Iranshahi also emailed defendant Lahiji, perhaps in a response, albeit a fairly late response, to defendant Vahid's chart. The email stated "we are obligated to you for the following 3 items" and contained the following table:

| Description | Amount | Date | |
| --- | --- | --- | --- |
| Office CF Tehran | - - - - - - - | 1389/7/15 [10/7/2010] | Start 1380/7/15 [10/7/2001] |
| Money | $350,000.00 | 1387/6/1 [8/22/2008] | Start in Iran |
| Khoms | $200,000.00 | - - - - | receipt will be provided |

**Refah Kudak's Audited Financial Statements**

As more fully explained in the government's motion *in limine* concerning the admissibility of Refah Kudak's financial statements, several different Iranian accounting firms audited Refah Kudak and produced financial statements over the years. These statements covered fiscal years running from June 1 of one year to May 31 of the following year, thus corresponding to the same fiscal year that CF US used for its IRS Form 990s.

Refah Kudak's audited financial statements track the defendants' Bank Karafarin investments in Iran, *i.e.*, what Yasrebi described to defendant Vahid as a certificate of deposit and to a lesser extent they also document that Refah Kudak did not own the office building (or house) in Tehran which was bought with the defendants' money. Although not perfect, these annual financial reports contain exhibits, statements and notes consistent with generally accepted accounting principles. And although they occasionally have some spelling or grammatical errors, these financial statements were prepared in English and are understandable.

One of the government's expert witnesses will explain to the jury how over time these financial statements document the defendants' ownership of the Karafarin Bank deposits, how those deposits grew over the years because Karafarin Bank paid approximately 20 percent

interest each year, and how those deposits disappeared from Refah Kudak's books after the government served search warrants on CF US's offices and the defendants' Texas residences in July 2008.

The initial auditor in the May 2003 report described the first $350,000 deposit as "a long-term, (5 years) deposit" "in accordance with [an] agreement between" the Institute and defendant Lahiji which at the end of five years would be spent for making an educational complex with Institute control. In Refah Kudak's May 2004 audited financial statement, the second $350,000 appears to be added to the earlier Karafarin Bank deposit which was still described as "long-term (five years) deposit" made in accordance with an agreement with defendant Lahiji. The 2004 statement also indicated that Refah Kudak additionally owed defendant Lahiji approximately 500 million Iranian rials (very roughly U.S. $56,000 at the time) as interest for "his deposit at Karafarin Bank."

A new accounting firm took over in 2005, and in the financial statements described the Karafarin Bank deposits more specifically in a note which read:

> 9-1. Based on the agreement between the Institute and Dr. Lahiji (one of the overseas supporters), the donation made by Dr. Lahiji amounting to IRR 5,268 million (US 632,000) has been deposited with Bank Karafarin. The deposit is for a term of five years earning interest of 20% per annum. Upon maturity date, the principal will be used for construction of health care and education complexes under the supervision of the Institute.

The 2005 financial statement also contained an accounts payable section. Note 11-1 in this section contained a subsection characterized as "Long-term liabilities," described as an "[a]ccount payable to Dr. Lahiji [which] is in respect of interest on deposit with Bank Karafarin, which has been explained in Note 9-1 above."

**Government's Trial Memorandum**                                                    **Page 13**

A third accounting firm took over and produced the May 2007 financial statement. There, the Karafarin Bank deposits are described as a liability of Refah Kudak consisting of "consigned funds" which are payable to defendant Lahiji. Additionally, the growing interest is listed as an account payable liability of close to four billion rials (very roughly US $425,000 at the time) owed to defendant Lahiji. The next year, in the May 2008 statement, the accountant noted that the consigned funds "are due to end of 2008 and Institute should payback deposit to MR [sic] Lahiji."

In the May 2009 statement, which was prepared after the July 2008 execution of search warrants at the CF US offices and the defendants' residences, the Karafarin Bank account references and the substantial liabilities owed to the defendants, disappeared from the financial statements. The consigned funds account had dropped to zero, and the accounts payable owed to defendant Lahiji had disappeared, indicating that both the principal and interest from the Karafarin Bank accounts owed to defendants had been paid. No explanation was provided.

### Tax Consequences

An IRS revenue agent will testify to the consequences of the defendants' conspiracy to impede the activity of the IRS. She has reviewed defendants' personal income tax returns for tax years ending December 31, 1998-2003 and 2005, and will outline defendants' claimed charitable deductions for those years. She has determined that defendants impermissibly reduced their tax due and owing by approximately $656,469 during the relevant time period by improperly deducting funds provided to CF US. She will also testify about the significance of material misrepresentations on CF US's Form 990 returns filed with the IRS as it relates to the flow of funds from the defendants through CF US.

/ / /

**Government's Trial Memorandum**                    **Page 14**

**THE CHARGES**

The grand jury returned a two-count indictment in this case against both defendants, as well as against fugitive co-defendant Ahmad Iranshahi.  Mehrdad Yasrebi and CF US are specifically named as co-conspirators.  Defendants are charged in Count One with conspiracy to defraud the United States in two respects – by use of deceitful or dishonest means to impede and obstruct the operations of OFAC in administering the Iranian Embargo and to impede and obstruct the operations of the IRS to conduct oversight of tax exempt organizations and to ascertain, assess, and collect income tax.  Count Two charges the defendants with a conspiracy to transport and transfer funds from a place in the United States to a place outside the United States with the intent to promote a violation of the Iranian Embargo.  The indictment also seeks forfeiture of all property involved in the offense charged in Count Two.  As represented in the government's Consolidated Response to the Defendants' Motions Against the Indictment (ECF No. 120), and in order to simplify the presentation of evidence in the case, the government will redact the indictment in light of the fact that co-defendant Iranshahi is not present before the Court.  Accordingly, a redacted indictment will be filed separately.

**ELEMENTS OF THE OFFENSES**

To convict a defendant of conspiracy the government must prove beyond a reasonable doubt:

Count One – Conspiracy to Defraud the United States

First, that beginning in or about May 1995, through at least July 2008, there was an agreement between two or more persons to defraud the United States by impeding, impairing, obstructing or defeating the lawful functions of the Office of Foreign Assets Control or the lawful functions of the Internal Revenue Service, by deceitful or dishonest means.

**Government's Trial Memorandum**                                                      **Page 15**

Second, that the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

Third, that one of the members of the conspiracy performed an overt act during the conspiracy for the purpose of carrying it out.[2]

Count Two – Conspiracy to Commit Money Laundering

First, that beginning in or about December 1998, through at least March 2007, there was an agreement between two or more persons to transfer funds from the United States to Iran to promote a violation of the Presidential Embargo against financial transactions with Iran; and

Second, the defendant became a member of the conspiracy knowing of its object and intending to accomplish it.

It is not necessary for any overt act to have been performed for a defendant to be found guilty of the conspiracy charged in Count Two.

Forfeiture

Section 982(a)(1) of Title 18 of the United States Code provides, in part, that whoever is convicted of a conspiracy to commit money laundering as alleged in Count Two shall forfeit to the United States "any property, real or personal, involved in such offense, or any property traceable to such property." Here, the approximately $1.9 million which the defendants transferred overseas through CF US to promote a violation of the Iranian Embargo is thus subject to forfeiture. Should the defendants be convicted by the jury of Count Two, the government will then present its case requesting a special verdict forfeiting the property involved in the commission of that offense. Proposed jury instructions regarding forfeiture and a special verdict form will be filed separately.

---

[2] Formal proposed jury instructions with legal citations are submitted separately by the government.

**Government's Trial Memorandum**                                                    **Page 16**

**The Defense**

One defense counsel has hinted that a possible defense to be proffered at trial involves the extent of time and resources used in the government's investigation of the defendants. Presumably, this is meant to suggest some kind of vendetta by the government which for some nefarious reason has decided to prosecute the defendants for what amounts to a *de minimis* technical charge. Defense counsel has requested that the government make available at trial all agents involved in this lengthy investigation, wherever they may be now located.

Such a defense has no place in a jury trial of this case. To begin with, the Presidential Embargo against Iran is a serious national security control, not a *de minimis* "technical" regulation. Conspiring to impede the government's administration of that embargo, and investing a million dollars in assets in Iran and providing substantial sums to the theocracy which runs that country, is no "technical violation" of the sanctions. Nor is conspiring to obstruct the IRS by using CF US to funnel money to Iran and avoid paying over $600,000 in income taxes a "minor violation."

Second, this seems to be in the nature of a selective or vindictive prosecution claim, which is a legal matter for the Court, not a factual matter for the jury. Like prosecutors and courts, juries, too, are subject to limitations on the scope of their authority. The division of responsibility between judge and jury places fundamental limits on the role of the jury in criminal cases. "By both tradition and constitutional mandate the jury is given the responsibility of determining guilt or innocence according to instructions of law delivered by the court." *United States v. Berrigan,* 482 F.2d 171, 175 (3d Cir. 1973). "[T]here has never been any constitutional requirement that the jury find facts other than those relating to the issue of [a defendant's] guilt or innocence." *Id.* at 176. "The Supreme Court has distinguished between the necessity for a jury

determination when the question is the defendant's guilt or innocence, and those preliminary matters concerning the right of the court to conduct the trial." *Id.* at 175 (citing *Ford v. United States,* 273 U.S. 593, 606 (1927).

The jury's role in finding a defendant's "guilt or innocence" includes finding "all the elements of the crime with which [a defendant] is charged," which includes "any fact that increases the penalty for a crime beyond the prescribed statutory maximum." *See United States v. Booker,* 543 U.S. 220, 227-28, 230 (2005) (explicating the proper division of fact-finding responsibility between the judge and jury). It is settled that claims of selective/vindictive prosecution are *independent* of the issue of defendant's guilt or innocence. In *United States v. Armstrong,* 517 U.S. 456, 463-64 (1996), the Supreme Court declared that "[a] selective-prosecution claim is *not* a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *See Armstrong,* 517 U.S. at 463-64 (emphasis added) (establishing strict pre-conditions that criminal defendants must show in order to obtain discovery regarding claimed selective-prosecution). Likewise, the Ninth Circuit has held that "[a claim of] selective prosecution does not constitute a challenge to the merits of the charges brought against the accused, nor could a disposition of the claim affect, or be affected by, a decision which is based on the merits." *See United States v. Wilson,* 639 F.2d 500, 502 (9th Cir. 1981) ("The issue of selective prosecution has nothing to do with whether the [defendants] did or did not [commit the charged offense].").

Other courts are in accord. *See, e.g., United States v. Washington,* 705 F.2d 489, 495 (D.C. Cir. 1983) ("the issue ... relates to an issue of law entirely independent of the ultimate issue of whether the defendant actually committed the crimes for which she was charged"); *United States v. Abboud,* 438 F.3d 554, 579-80 (6th Cir. 2006) (selective prosecution claim is "a matter

**Government's Trial Memorandum** **Page 18**

that is independent of a defendant's guilt or innocence, [and] so it is not a matter for the jury"); *Berrigan,* 482 F.2d at 175 ("The question of discriminatory prosecution relates not to the guilt or innocence of [defendants], but rather addresses itself to a constitutional defect in the institution of the prosecution.").

Because a claim of selective/vindictive prosecution is a question of law that is independent of a defendant's guilt or innocence, it is for the court to decide, *not* a matter that may be tried before or submitted to a jury. *See Washington,* 705 F.2d at 495 (rejecting defense claim that issue of selective prosecution should have gone to the jury); *Berrigan,* 482 F.2d at 175 (affirming exclusion of "evidence of discriminatory prosecution to the jury"); *Abboud,* 438 F.3d at 579-80 (affirming exclusion of evidence of selective prosecution because "a 'defense' of selective prosecution is a matter for the court, not the jury."); *United States v. Jones,* 52 F.3d 924, (11th Cir. 1995) ("[S]elective prosecution is a defect in the institution of the prosecution that has no bearing on the determination of factual guilt"; "[It] is an issue for the court to decide, not an issue for the jury."); *see also United States v. Wylie,* 625 F.2d 1371, 1378 (9th Cir. 1980) (rejecting defendants' argument that they were entitled to jury instruction on the alleged "outrageousness" of government conduct, because that is a "question of law for the court"). Evidence and argument regarding a supposed "vendetta" is, therefore, logically irrelevant at trial under Fed. R. Evid. 402 and the court should exclude it.

Rule 12(b)(3) of the Federal Rules of Criminal Procedure provides a separate, independent basis for the exclusion of evidence and argument regarding defendants' anticipated selective/vindictive prosecution claims. Whatever is the defendants' claim, it should have been raised pretrial under Federal Rule of Criminal Procedure 12(b), but was not. *See, e.g., United States v. Oaks*, 508 F.2d 1403, 1404-05 (9th Cir. 1974) (holding that "defense of [discriminatory

**Government's Trial Memorandum**                                      **Page 19**

prosecution] must be presented in accordance with the requirements of Rule 12(b)(2)"); *United States v. Bryant,* 5 F.3d 474, 476 (10th Cir. 1993) ("A selective prosecution claim clearly qualifies as ... an objection [to the institution of the prosecution that is subject to Rule 12(b)(3)]."); *United States v. Taylor,* 562 F.2d 1345, 1356 (2d Cir. 1977) (holding that defendant's claim that "he was selectively prosecuted on a discriminatory basis, invidiously and in bad faith" in retaliation for having obtained a dismissal of prior criminal cases was subject to Fed. R. Crim. P. 12(b)(1)).  In short, Rule 12(b)(3) makes clear that defendants' anticipated "vendetta" arguments may not be presented to the jury at trial. Thus, the Court should bar defendants and their counsel from making any attempt to raise such matters, either by way of argument, cross-examination of government witnesses, or the introduction of evidence in defendants' case-in-chief.

Furthermore, such a "defense" would require the government to rebut the implication of a vendetta by introducing evidence as to why law enforcement was investigating the defendants, including, *inter alia*, referring to the evidence underlying the current prosecution in the Southern District of Texas where the defendants are charged with serious offenses involving health care fraud, including billing Medicare, Medicaid, and private health insurers for medical services not rendered, services not covered, services not performed by a qualified person, and services not ordered by a physician.  They are alleged to have billed for treatments supposedly provided by defendant Lahiji on days when he was in Iran and to have used unqualified employees to treat patients in his absence, thus placing patients at risk of physical danger.  They are additionally charged with a conspiracy to violate the Iranian Embargo separate and post-dating the conspiracy at issue with CF US in this case, in which they transferred another $1.1 million to Iran through a separate and independent confederate in California.

**Government's Trial Memorandum**                                                                 **Page 20**

**The Government's 404(b) Notice**

FRE 404(b) requires that, upon request from the defense, the prosecution shall provide reasonable notice of the general nature of any intent to use "other act" evidence, admissible to establish a defendant's knowledge, intent, lack of mistake, etc.

The government believes that some of the evidence described below is direct evidence of the charged crimes. That is, the admissibility of such evidence is not dependent on Rule 404(b), as it is "inextricably intertwined" with the case. In an abundance of caution, and mindful of the notice provisions of FRE 404(b), however, the government produces this information as its notice of evidence possibly admissible under Rule 404(b):

1. In October 2001, defendant Najmeh Vahid attempted to wire transfer $200,000 to Iran via Texas State Bank. Bank personnel told her that they could not wire money to Iran. Within the next two months, defendant Vahid sent $100,000 in two checks drawn on Texas State Bank to the Laree Exchange in Abu Dhabi, United Arab Emirates for the purpose of transferring funds to Iran.

2. In February 2002, US Customs intercepted a DHL package sent by defendants which was addressed to defendant Vahid's father in Isfahan, Iran. The airway bill listed the contents of the package as "documents." It contained $68,900 in $100 bills. In a March 2002 petition to US Customs to receive the money back, the defendants acknowledged that US banks would not send money to Iran and claimed to be unaware of regulations requiring the declaration of more than $10,000 in currency leaving the country. Customs ultimately

assessed a $500 penalty for failing to declare the currency and returned the balance of the money.

3. In May 2002, US Customs seized another DHL package send by defendants to be shipped to Isfahan, Iran.  This time the package contained $4,000 in US currency.

4. In November 2003, defendant Lahiji was boarding a plane for Amsterdam when he was sent to secondary outbound inspection by US Customs.  He then declared $20,000 in US currency which he claimed he was taking to his sick father.  He claimed to be unaware of the regulation requiring the declaration of more than $10,000 for persons taking money out of the country.

5. In December 2003, defendants were interviewed by an Immigration and Customs Enforcement ("ICE") Special Agent Padriac Paffen about the February 2002 attempt to send $68,900 in currency to Iran via DHL.  In the course of the discussion, Paffen told the defendants that they needed to contact OFAC before sending any further money to Iran because there were restrictions on the transfer of such funds to the government and people of Iran.

6. In February 2004, Special Agent Paffen spoke with defendant Lahiji at the defendant's medical office.  In the course of the discussion, defendant Lahiji stated he wanted to send money to Iran to help victims of an earthquake, although he did not know to whom or to where he would send it.  Agent Paffen told him he needed to call OFAC if he had questions about sending money to Iran.  Defendant Lahiji stated that he had heard that there was a 90-day period in which people could send money to Iran for earthquake relief.

**Government's Trial Memorandum**                                    **Page 22**

7. In March and April 2005, two ICE special agents, including Agent Paffen, had a series of conversations with defendant Vahid about her previous attempts to transfer money to Iran and her claim that the money was to take care of sick relatives. On April 13, 2005, defendant Vahid told the ICE agents that she and defendant Lahiji wanted to start a business in Iran to help their families. Agent Paffen once again advised defendant Vahid to contact OFAC prior to starting a business in Iran. Defendant Vahid falsely told the agents that her accountants had said it was OK. The next day, April 14, 2005, defendant Vahid wired approximately $300,000 to three separate locations which she later identified to her accountants were used for a real estate business in Iran with her father where the defendants received 60% of the profits. Several days later, she wired another $200,000 overseas for transfer to Iran.

## Demonstrative Evidence

To assist the jury in better understanding the case, the prosecution intends to use a "PowerPoint" presentation during opening statement. Additionally, there will be numerous individuals mentioned during trial, whose activities are relevant to the case. The prosecution will thus use a physical chart, with the names of some of the more prominent individuals, along with available photographs of them. The jury should be allowed to view this chart throughout the case to better comprehend the individuals mentioned throughout the course of the trial. The Power Point presentation and chart will not be offered as exhibits, but as demonstrative jury aids.

## Summary Evidence

To assist the jury and save trial time, the government will present summary exhibits and testimony.

**Government's Trial Memorandum**                                                    **Page 23**

Proposed government exhibits will summarize the flow of money from the defendants to CF US, from CF US to various third country intermediaries, including the United Arab Emirates and Switzerland, and then, when available, into Refah Kudak accounts in Iran. These summaries are admissible under FRE 1006. *See United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (summary evidence admissible so long as underlying records admissible as well). The information underlying the summaries has been provided to the defense; the summaries are admissible under FRE 1006.

### Agent Testimony

It is anticipated that many exhibits will be received at trial without any initial explanation of their significance for the jury. Categories of information like this include:

- domestic CF US and defendants' bank records;

- international bank records from UBS Bank in Switzerland;

- e-mails and other electronic information from the seized computers and a search warrant executed on co-defendant Iranshahi's Yahoo email account;

- Physical documents secured from execution of search warrants in Portland and Texas; and

- Phone calls and faxes intercepted by the FBI, and documents obtained during a physical search by the FBI, all pursuant to the Foreign Intelligence Surveillance Act.

The significance of many of these seemingly unrelated exhibits will be unclear to the jury as those exhibits are being introduced. To assist the jury to make sense of the exhibits, Special Agent Kimberly Price will testify in the case-in-chief. She will review with the jury the details of many of these exhibits in a topical and chronological fashion, putting the various items of

**Government's Trial Memorandum**                                                                          **Page 24**

evidence into a comprehensible light.  The Ninth Circuit has recognized that such summary evidence "can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of the multitude of witnesses." *United States v. Shirley,* 884 F.2d 1130, 1133 (9th Cir. 1989), *quoting United States v. Lemire*, 720 F.2d 1327, 1348 (D.C.Cir. 1983). *See also United States v. Baker*, 10 F.3d 1374, 1410-12 (9th Cir. 1993) (proper under FRE 611(a) to permit agent to testify in summary form as to value of drug evidence presented during trial, providing helpful clarity for jury).

### Swiss Bank Records

The United States received bank records from UBS Bank in Switzerland concerning the account of CF US's Swiss affiliate, Emdad Kudak.  These records are directly relevant to the trial because they document the flow of money from CF US to Switzerland, and then on to Refah Kudak in Iran, during a period from 2001 through 2005, including the defendants' money which CF US was funneling to Iran for the defendants' personal benefit.

The Swiss bank records were received with a "Certificate of Authenticity of Business Records," which renders the records admissible at trial without the need to call a foreign witness from Switzerland or from UBS Bank.  Pursuant to 18 U.S.C. §3505(a), a foreign record of regularly conducted activity is not excluded by the hearsay rule if a foreign certification attests to the requirements set forth in 18 U.S.C. § 3505(a)(1)(A)-(D).

Section 3505(a) requires the foreign certification to attest that:

- the record was made at or near the time of the occurrence of the matters set forth by a person with knowledge of such matters;

- such record was kept in the ordinary course of a regularly conducted business activity;

- the business activity made such a record as a regular practice; and

**Government's Trial Memorandum**                                      **Page 25**

- if such record is not an original, such record is a duplicate of the original;

unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

A proper certification serves to authenticate the records and obviates the necessity of calling a live witness to establish authenticity. It also is sufficient to overcome hearsay objections. *See United States v. Jawara*, 474 F.3d 565, 584 (9th Cir.2007) (district court properly admitted foreign records over hearsay and authentication objections because records certified in compliance with 18 U.S.C. § 3505).

Here, one Caterina Alegretti, an employee of UBS AG, in Zurich, Switzerland, appeared before Swiss Examining Magistrate Michael Eberhard and while subject to criminal penalties for false statements signed a Certificate of Authenticity which met all of the requirements of 18 U.S.C. § 3505(a) in August 2009. Thus, the records are admissible at trial without the need for the prosecution to call a foreign witness. *Id.* (noting that Congress enacted § 3505 to streamline the admission of foreign bank records); *United States v. Hagege*, 437 F.3d 943, 956-58 (9th Cir. 2006) (rejecting confrontation, authentication and hearsay challenges to foreign records received under 18 U.S.C. § 3505).

**Miscellaneous Matters**

1.    Stipulations

Defense counsel has agreed to the government's request that they stipulate to the admission of various business records without the necessity of the government calling the Custodian of Records from the following entities to testify to the foundation of the records under FRE 803(6) or public records under FRE 803(8) and 901(7):

1.    Bank of America
2.    Lone Star Bank

**Government's Trial Memorandum**                                                                **Page 26**

3.    Texas State Bank
4.    DHL
5.    Federal Express
6.    Yahoo! Inc.
7.    T-Mobile
8.    Verizon
9.    Century Link (Quest)
10.    Sprint
11.    GTE
12.    SBC (Southwestern Bell
13.    The Oregon Secretary of State
14.    Internal Revenue Service

The defendants preserve any non-foundational arguments against the admission of such records on the grounds of relevance, prejudice, etc.  The government has agreed to offer a similar stipulation for the records of any United States-based business if such records are identified sufficiently in advance of trial for the government to verify their authenticity.  To date, the defense counsel has not identified any such records to government counsel.

2.    Discovery

The government has continued to make discovery during the period prior to the filing of this trial memorandum.  Classified recordings and e-mails recently which defense counsel requested be declassified have just been declassified by FB"I Headquarters, and some additional classified documents, primarily in the nature of Jencks Act statements of government witnesses, are still in the process of being redacted and declassified.

3.    Translations of Telephone Calls, Emails, and other Documents from Farsi into English

FBI linguists have translated the evidence in this case which is in the Farsi (Persian) language spoken in Iran into English.  The government long ago provided draft translations to the defense of the evidence to be introduced into trial.  More recently, final translations have been provided to the defense.

**Government's Trial Memorandum**                                                                     **Page 27**

On February 25, 2013, the government sent to defense counsel copies of final transcripts for all of the phone calls it intends to introduce in its case-in-chief at trial. On April 19, 2013, the government additionally sent final translations for most of the written Farsi documents that the government intends to introduce at trial. On April 25, 2013, the government received some objections from the defense to some sections of the English transcripts of the translated phone calls. The government will have the FBI linguist responsible for the translations review these objections as soon as possible and work with defense counsel in an attempt to resolve as many of these differences as possible before the scheduled pretrial conference.

4.     Introduction of Recorded Phone Calls

During its case-in-chief, the government will introduce all or relevant excerpts of approximately 15 intercepted phone calls. Most (although not all) of these phone calls were conducted in Farsi. The audio of some of these Farsi calls will be played for the jury, with a running English translation provided for the jury. With other phone calls, the government will have persons read the English transcripts of the phone calls for the jury.

DATED this 29th day of April 2013.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

s/ *David L. Atkinson*
**DAVID L. ATKINSON, OSB #75021**
Assistant United States Attorney

s/ *Charles F. Gorder, Jr.*
**CHARLES F. GORDER, JR., OSB #91287**
Assistant United States Attorney