**S. AMANDA MARSHALL, OSB #95347**
United States Attorney
District of Oregon
**CHARLES F. GORDER, JR., OSB #91287**
Assistant United States Attorney
charles.gorder@usdoj.gov
**DAVID L. ATKINSON, OSB #75021**
Assistant United States Attorney
david.atkinson@usdoj.gov
1000 S.W. Third Ave., Suite 600
Portland, OR  97204-2902
Telephone:  (503) 727-1000
Facsimile:  (503) 717-1117
Attorney for United States of America

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON
## PORTLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case Nos. 3:10-CR-00506-KI |
| v. | **UNITED STATES' MOTION *IN LIMINE* TO ADMIT IRANIAN FINANCIAL STATEMENTS** |
| HOSSEIN LAHIJI, and NAJMEH VAHID, a.k.a. Najmeh Lahiji, | |
| Defendants. | |

The United States of America by S. Amanda Marshall, United States Attorney for the

District of Oregon and Charles F. Gorder, Jr. and David L. Atkinson, Assistant United States

Attorneys, hereby files its Motion *in Limine* in support of the admissibility of audited financial

statements of co-conspirator Refah Kudak.  To avoid repetition, this memorandum assumes that

the reader has previously reviewed the United States' trial memorandum.

As developed in the trial memorandum, Child Foundation's (CF US') alter-ego in Iran,

Refah Kudak (RK), commissioned the issuance of audited financial statements each year by

**Motion *in Limine* to Admit Iranian Financial Statements**                               **Page 1**

Iranian accounting firms between 2002 and 2009.  The financial statements not only account for RK's financial activities during those years, but also specifically and categorically account for a significant percentage of the funds that defendants Lahiji and Vahid provided to CF US.  The audited statements are essential to understanding the financial relationship between defendants and the various co-conspirators and are central to the government's case.  The financial statements are attached as Memorandum Exhibits 8-15, and marked as trial exhibits 123(a)-(d), 124(a), 126(a), 128 and 129.  Because defendants chose to conduct business in Iran, a nation with which we have no diplomatic relations and which is beyond the processes of both this Court and the executive branch, the preparers of the audit will not be before the Court.  Nor is there any prospect of obtaining an 18 U.S.C. § 3505 foreign business records certification.

By way of background, the evidence will demonstrate that co-conspirator Mehrdad Yasrebi (Yasrebi) founded RK in Iran, along with his parents and cousin, co-conspirator Ahmad Iranshahi.  It was registered with the Iranian government on April 10, 1999.  Iranshahi initially served as the treasurer and as a board member, effectively advancing to CEO during times relevant to this prosecution.  Evidence completely independent from RK's financial statements demonstrates that through mid-2008, CF US and Yasrebi sent approximately $10.8 million to RK in Iran using various schemes outside normal banking channels to evade the embargo against Iran.

Defendants provided CF US with about $1.9 million between 1998 and 2008.  The evidence will demonstrate that Yasrebi and Child Foundation transferred virtually all of the funds provided by defendants to RK in Iran.  RK, in turn, used significant percentages of the funds defendants provided to CF US – ostensibly charitable donations -- to purchase real property in Iran for defendants' benefit.  Some of the funds were provided to Makarem Shirazi,

**Motion *in Limine* to Admit Iranian Financial Statements** **Page 2**

an Iranian cleric, at defendants' request in order to discharge their "khoms" obligations.   And

RK used approximately $700,000 of defendants' money to establish and maintain investment

accounts – analogous to certificates of deposit – at Bank Karafarin, an Iranian bank, for 5-year

terms at about 20% annual interest.

RK's audited financial statements are particularly relevant because they establish and

track defendants' Bank Karafarin investments in Iran – *i.e.* evidence at the heart of the

indictment.  The annual financial reports contain summaries, exhibits, statements and notes

consistent with audited financial statements.  Within the first few pages of each audit one finds a

statement that it was prepared according to generally accepted professional accounting standards.

The financial statements are English language versions.  To assist the Court in the analysis of the

evidentiary admissibility of the RK financial statements, this discussion will begin by grouping

the financial statements according to the circumstances by which investigators acquired them,

rather than chronologically.

**2005 RK financial statement**.  The first such statement acquired by the government was

prepared by the Iranian accounting firm Tadvin and Company of Tehran, Iran for the period June

2004 through May 31, 2005, and includes comparative data from the June 2003 through May

2004 period (Memo Ex. 11; Tr. Ex. 123(d)).  It is entitled "Refah Kudak Charity Institute Report

of the Independent Auditor and Financial Statements 31 May 2005."  It contains a statement

from the auditors that in their opinion "the financial statements . . . present fairly, in all material

respects, the financial position of the Refah Kudak Charity Institute as of 31 May 2005 and the

results of its operations and cash flows for the year then ended in conformity with the

Accounting Standards Generally Accepted in Iran."  Memo Ex. 11, p. 2.

As pertinent to this case, the statement reports an asset described as a "long term investment" in Iran's Bank Karafarin in the sum of 5,853,200,000 IRR (Iranian Rials) – or very roughly $656,000, depending upon the exchange rate employed -- as of May 31, 2005.[1]  As set out in the government's trial memo, the 2005 financial statement contains a note describing the Bank Karafarin account as follows:

> 9-1.  Based on the agreement between the Institute and Dr. Lahiji (one of the overseas supporters), the donation made by Dr. Lahiji amounting to IRR 5,268 million (US 632,000) has been deposited with Bank Karafarin.  The deposit is for a term of five years earning interest of 20% per annum.  Upon maturity date, the principal will be used for construction of health care and education complexes under the supervision of the Institute.

Memo Ex. 11, p. 12.  This statement also contains an accounts payable section.  Note 11-1 in this section reveals a subsection characterized as "Long-term liabilities," described as an "[a]ccount payable to Dr. Lahiji [which] is in respect of interest on deposit with Bank Karafarin, which has been explained in Note 9-1 above."  The liability owed defendant Lahiji is in the amount of IRR 1,615,689,536 (or roughly $181,000) with a smaller, comparative figure for 2004 showing that the liability had increased during the fiscal year.  Memo Ex. 11, p. 12.

Mike Schlect with U.S. Customs and Border Protection will testify that he found and copied the 2005 RK financial statement during the course of an immigration inspection of co-conspirator Yasrebi in December of 2005 as he returned to the United States from a trip to Iran.

On a totally different track, Certified Public Accountant Jon Resnick served as CF US' tax preparer and auditor from 2003-06.  Mr. Resnick will testify that Yasrebi provided RK's

---

[1]  This memorandum relies upon the exchange rate reported at http://www.farsinet.com/toman/exchange.html.  RK's financial statements, when viewed collectively, indicate that 500,000,000 IRR of the Karafarin account in that fiscal year, or roughly $56,000, were not part of the Lahiji funds.

**Motion *in Limine* to Admit Iranian Financial Statements** **Page 4**

2005 audited statement to him -- along with other explanatory documents -- in support of his audit of CF US for the fiscal year ending May 31, 2005.  Mr. Resnick will testify that he requested a copy of RK's audit in an effort to confirm whether funds provided to and transferred by CF US actually reached RK and were used for the purposes intended by the donors.

Mr. Resnick's testimony will establish that Yasrebi provided him with the 2005 RK financial statements as the accounting for the disposition of the majority of CF US's revenues which had been transferred to RK.  Indeed, as more fully developed below, CF US and RK held out RK's financial statements to the general public, adopting them and then utilizing them in their business dealings, advertising, publications and fund raising activities.

In response to a grand jury subpoena issued several years later, Mr. Resnick produced the 2005 RK statement (with the '04 comparative figures) among the work papers he provided to the government during the course of the investigation.

The United States will also establish that in July 2009 Special Agent Glenn Dimmick with Immigration and Customs Enforcement (now Homeland Security Investigations or HSI) applied for and acquired a Rule 41 criminal search warrant authorizing the search of the Yahoo! email account of Iranshahi.  Significantly, the account held a series of emails exchanged between Yasrebi and Iranshahi at the end of the fiscal year following the execution of the July 2008 search warrants directed at CF and Yasrebi in Oregon and defendants in Texas.  Within this exchange of emails was an attachment containing *inter alia* the 2005 RK financial statement described above.  Thus, defendants' co-conspirators included the RK financial statements in their internal communications in furtherance of the conspiracy.  This series of emails also contained attachments with the audited RK financial statements for 2002 through 2007 (Memo Exhs. 8-13), all in English.

**Motion *in Limine* to Admit Iranian Financial Statements**                                    **Page 5**

**2007 RK financial statement**.  RK's audited financial statement for the fiscal period ending May 31, 2007, includes comparative data for the June 2005 through May 2006 period. (Memo Ex. 13; Tr. Ex. 126(a)).  The 2007 financial statement was prepared by Iranian CPA firm Armoon Gostaran Pishgam of Tehran, Iran.  Focusing on the Lahiji account, the 2007 statement utilizes slightly different nomenclature, categorizing the Bank Karafarin account as "Consigned Long Term Investments" rather than "long term investment" as in 2005.  Memo Ex. 13, p. 12. Note 10-1 is identical to note 9-1 in the 2005 audited statement, set out verbatim above, regarding "the agreement between the institute and Dr. Lahiji (one of the overseas supporters)," and the deposit of US 632,000 with Bank Karafarin "for a term of five years earning 20% interest per annum" and the construction of "health care and education complexes under the supervision of the Institute" upon maturity of the investment.  *Id.*

The principal of the Lahiji Karafarin account is reported as a liability on 2007 RK's balance sheet.  The "accounts payable" section reports that significant funds were owed to "Mr. Lahiji."  Note 17-1 states that "payables to Mr. Lahiji consist of the principal of granted fund and relative interest which deposited at Karafarin Bank." Memo Ex. 13, p. 16.

IRS Special Agent Deri Battles will testify that she seized the 2007 RK financial statement during the execution of a search warrant on Yasrebi's residence in July 2008.  Trial evidence will also show that the 2007 statement was acquired via the Yahoo! email search warrant described above.  It was also attached to internal communications among the co-conspirators.

**2002-2004 RK financial statements.**  The evidence will establish that the 2002 through 2004 RK audited financial statements – the oldest acquired during the investigation – were all

**Motion *in Limine* to Admit Iranian Financial Statements**                                    **Page 6**

prepared by Certified Public Accountants at the Mohaseb Kish auditing firm of Teheran.  (Memo Exhs. 8-10; Tr. Exhs. 123(a)-(c)).

The 2002 statement contains a category described as "received supports" which mentions the building in Tehran used by RK.[2]  It notes that the "Tehran building has been dedicated for 10 years to inistitute (sic) treasurer [Iranshahi] and the rental received has been considered as received support and recorded in accounts."  Memo Ex. 8, p.19.  The 2002 statement predated the establishment of the Lahiji Karafarin account, so there is no report thereon.

The '03 and '04 statements are the first to note the Bank Karafarin account, consistent with other evidence to be adduced during the trial that Lahiji provided $350,000 to CF US in both of those years.  The '03 statement shows approximately $349,000 in rials as "Cash in Bank – Karafarin Bank (deposit)."  Memo Ex. 9, p. 9-10.  The '04 figure notes the rough equivalent of $625,000 in rials in the Karafarin account.[3]  Memo Ex. 10, p. 12.  Both statements contain notes stating that the Karafarin account is in "[a]ccordance with agreement between Institute and Mr. Lahiji (one of sponsors) as a long term (5 year's) deposit.  The above amount received from him, at the end of 5 years will spend for making educational complexes with Institute control."[4]  Memo Ex. 9, p. 10; Ex. 10, p. 13.  And the '04 statement is the first to report under "Accounts Payable" a sum "payable to Mr. Lahigi (sic) . . . for interest of his deposit in Karafarin Bank."  Memo Ex. 10, p. 22.  As noted above, the '02, '03 and '04 statements were attached to the series

---

[2]  As noted in the government's trial memo, other evidence will show that this building was purchased with funds supplied by defendants to CF US in Oregon and deducted from their income taxes as a charitable donation.  The building was titled in defendant Lahiji's sister's name.  Defendants provided Iranshahi with a "Power of Attorney" over the building for a period of 9-10 years.

[3]  Defendants' later communications with Yasrebi and Iranshahi suggest that they authorized about $67,000 of the $350,000 to be used for charity and not maintained in the Karafarin account.  Tr. Ex. 66.

[4]  The note contained in the '03 RK statement contains essentially identical substance but has several spelling errors.  Memo Ex. 9, p. 10.

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 7**

of 2009 email communications between Yasrebi and Iranshahi concerning RK's financial statements.

**2006 RK financial statement.**  Like the 2005 statement, the 2006 RK financial statement was audited by Tadvin and Company and contains the same note as the previous year about defendant Lahiji's Bank Karafarin account.  (Memo Ex. 12, p. 11; Tr. Ex.124(a)).  Substantial other evidence to be adduced at trial shows that during this fiscal year, Iranshahi dipped into the Lahiji Karafarin account without defendants' approval to remedy a cash shortfall for RK.  As noted in the government's trial memorandum, intercepted communications between Yasrebi, Iranshahi and both defendants will show that Iranshahi and Yasrebi sought after-the-fact approval from defendant Lahiji to prevent RK's Iranian auditors from adversely reporting that event in RK's '06 audit.   Defendant Lahiji ultimately faxed an approval to Iranshahi and Yasrebi, thereby staving off the adverse report.   The financial statement for '06 reflects these facts, reporting that funds were withdrawn from the Lahiji account, "providing operating liquidity."  Memo Ex. 12, p. 11.

The United States acquired the 2006 audited statement during the service of the Yahoo! search warrant as described above, attached to email exchanged between co-conspirators.  The 2006 financial figures also appear for comparative purposes in the 2007 RK statement, which the United States seized during the course of the service of the 2008 search warrant on Yasrebi's residence in Clackamas, Oregon.

**2008 RK financial statement.**  The audited RK financial statement for the period ending May 31, 2008, was prepared by Iranian CPAs working for the same firm that prepared the '07 statement.  Memo Ex. 14.  It characterizes the Lahiji Karafarin account in the same way as the '05 and '07 statements, as set out above. *Id.*, p. 12.  The principal of the Lahiji Karafarin

**Motion *in Limine* to Admit Iranian Financial Statements**                                        **Page 8**

account is reported as a liability, not an asset.  The audited statement lists roughly $582,000 in rials as "consigned funds," a sum described at note 17-1 as follows:  *"[p]ayables to Mr. Lahiji consist of the principle (sic) of granted fund and relative interest which deposited at Karafarin Bank."*  Memo Ex. 14, p. 16 (emphasis added).  Significantly, the audit note continues:  *"It should be noted that deposit time is due to end of the year 2008 and Institute should payback deposit to Mr. Lahiji."*  *Id.* (emphasis added).

The United States acquired the 2008 audited RK financial statement from Child Foundation's attorney in lieu of service of a grand jury subpoena, after the investigation became overt.  The *report,* however, was prepared before the investigation became known to the conspirators with the service of the search warrants in July 2008.

**2009 RK financial statement**.  The 2009 audited RK financial statement was the first to have been prepared after the investigation became overt – *i.e.* after agents served search warrants on various locations associated with defendants, CF US and Yasrebi.  The "consigned long term investments" category under which the Lahiji Karafarin account had been grouped in the previous year is now zeroed out.  Memo Ex. 15, p. 9.  There are no explanations or notes.  "Reconciliation of Operating Income" now contains a subcategory for the first time characterized as "Increase (Decrease) in distributable f (sic) Mr. Lahiji funds" showing a decrease of roughly $692,000 in rials.  *Id.* p. 16.  Like the 2008 statement, the United States acquired the 2009 audited RK financial statement from an attorney for Child Foundation in lieu of service of a grand jury subpoena, after the investigation became overt.

**The RK financial statements are admissible as non-hearsay statements of defendants' coconspirators.**  Federal Evidence Rule 801(d)(2)(E) provides that "[a] statement is

not hearsay if it is offered against a party and is a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."

Although this rule is commonly referred to as the "co-conspirator exception" to the hearsay rule, it is technically not a hearsay exception. The exceptions to the hearsay rule are provided for in Federal Rules of Evidence 803 and 804. Rather, the "co-conspirator exception" is contained in Rule 801(d)(2) which governs admissions by party-opponents. Rule 801(d) specifically states that such statements "are not hearsay" and there is no need to analyze whether they fit within an exception to the hearsay rule. Further, if a co-conspirator's out-of-court statement is admissible under Rule 801, the Confrontation Clause is satisfied and the trial court need not independently inquire into the reliability of the statements. *Bourjaily v. United States*, 483 U.S. 171, 181-84 (1987).

The theory under which a co-conspirator's out of court statement is admitted is that each member of the conspiracy is considered to be an agent of every other member of the conspiracy, and an agent's admissions and actions are binding on the principal:

> The co-conspirator exception to the hearsay rule ... is merely a rule of evidence founded, to some extent, on concepts of agency law. It may be applied in both civil and criminal cases ... Its rationale is the common sense appreciation that a person who has authorized another to speak or to act to some joint end will be held responsible for what is later said or done by his agent, whether in his presence or not.

*United States v. Peralta*, 941 F.2d 1003, 1006-07 (9th Cir. 1991).

In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court held as a general rule that an out-of-court statement which is testimonial (i.e., given under circumstances suggesting the potential for later use in a criminal prosecution) would be barred under the Confrontation Clause unless the declarant was unavailable and the defendant had a prior

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 10**

opportunity to cross-examine the declarant. However, the Court noted "business records" and "statements in furtherance of a conspiracy" as examples of "statements that by their nature were not testimonial." *Id.* at 56 (emphasis added).

**Procedures for determining admissibility**. "[P]reliminary question[s] about whether … evidence is admissible" shall be determined by the court. "In so deciding, the court is not bound by evidence rules . . . ." Fed. R. Evid. 104(a). Thus, under Rule 104(a), the court may consider even admittedly inadmissible evidence – from virtually any source except privileged material -- in determining questions of evidentiary admissibility.

Conspirator statements should be admitted only after the trial court determines that they fall within the definition of the rule. *Bourjaily* at 483 U.S. 175. A separate hearing on the admissibility of the statements is not required. *United States v. Long*, 706 F.2d 1044, 1053 (9th Cir. 1983). The government must establish the admissibility of the statements by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175-76; *Peralta*, 941 F.2d at 1007. In determining whether a co-conspirator's statements are admissible, the trial court is not restricted to evidence independent of the statements sought to be admitted and may rely upon the statements themselves in determining their admissibility. *Bourjaily*, 483 U.S. at 180-81. "The statement must be considered but does not by itself establish . . . the existence of the conspiracy or participation in it under [Rule 801(d)(2)(E)]." Fed. R. Evid. 801(d)(2). There must be some evidence of the existence of a conspiracy, independent of the statement(s), in order to predicate admissibility. In determining admissibility, "[t]he court must consider . . . the circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement was made, or evidence corroborating the contents of the statement in making its determination as to each preliminary question." Fed. R. Evid. 801 advisory committee note, 1997 amendment.

**Motion *in Limine* to Admit Iranian Financial Statements** **Page 11**

A co-conspirator's statement is admissible against a defendant "where the prosecution shows by preponderance of the evidence that (1) the conspiracy existed when the statement was made; (2) the defendant had knowledge of, and participated in, the conspiracy; and (3) the statement was made 'in furtherance of' the conspiracy." *United States v. Larson*, 460 F.3d 1200, (9th Cir. 2006) (citing *United States v. Bowman*, 215 F.3d 951, 960-61 (9th Cir.2000) (citing *Bourjaily*, 483 U.S. at 175)). "It is not necessary that the statement be made to another member of the conspiracy for it to come under rule 801(d)(2)(E)." *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993). And the time at which a defendant joins a conspiracy is of minimal significance. Statements made by co-conspirators *before* a defendant joins a conspiracy are admissible against the later-joining conspirator. *United States v. Segura–Gallegos*, 41 F.3d 1266, 1271 (9th Cir.1994) (citations omitted).

**A conspiracy existed and defendants were members**. With the above-mentioned principles in mind, the United States asserts that in addition to the RK financial statements themselves which are described above, substantial independent evidence – apart from the financial statements -- establishes that there was a conspiracy as alleged and that defendants were members. Financial records will independently establish that between 1999 and 2006 defendants provided CF US with approximately $1.898 million. Each defendant signed at least one six-figure check that was provided to CF US. Independent exhibits and witness testimony at trial will establish that defendants deducted virtually all of the funds provided to CF US, with the exception of negligible amounts, as charitable contributions on their jointly-filed US Form 1040 tax returns in each year between 1999 and 2006 (except for 2004).

**Real property.** As noted above, the 2002 RK financial statement notes that the "Tehran building has been dedicated for 10 years to inistitute (sic) treasurer [Iranshahi] and the rental

**Motion *in Limine* to Admit Iranian Financial Statements** **Page 12**

received has been considered as received support and recorded in accounts." The following independent evidence corroborates the existence of a conspiracy between Yasrebi, Iranshahi, CF US, RK and defendants to defraud the IRS and OFAC by (1) facilitating the investment in real property in Iran in violation of the embargo, and (2) facilitating the claim by the Lahijis of an improper charitable tax deduction for the purchase of the building disguised as a cash contribution to CF US:

•    Summer 2000 – CF US newsletter contains article entitled "Urgent need for Office" written by coconspirator Iranshahi. Article seeks "donation" of office space for CF Iran. (Tr. Ex. 51).

•    Fall 2000 – *Child Foundation Hamyaran* Magazine publishes article in 2004 indicating that "[t]he building where Child Foundation office is currently located in Tehran was allocated for our use by Dr. Hossein Lahiji in [2000]." Article describes office and contains photo. Exh. 2. (Tr. Ex. 52).

•    10/2000 – CF US files Form 990 tax return signed by Yasrebi showing land & office bldg. in Tehran as $245,000 asset; showing as liability a note payable to Dr. H. Lahiji for $245,000 non-interest bearing loan on office bldg. (Tr. Ex. 132).

•    10/2000 – internal email from RK employee to Iranshahi dated 11/6/2005 with a summary chart of "Mr. Lahiji's account." The chart reports *inter alia* the purchase of house in 2000 for $250,000 on Mr. Lahiji's account, with a note reading "(till the end of 2011)." (Tr. Ex. 62).

•    10/2000 – Power of Attorney (POA) signed by Lahiji's sister in Iran in favor of Iranshahi allowing use of house in Iran valid for "9 complete solar years." (Tr. Ex. 57).

•    2001 – defendants' joint 1040 tax return for 2000 claims as charitable deduction the funds provided to CF US. CF US receipts are attached to the return. (Tr. Ex. 142). [5]

•    4/2/2004 to 4/4/2004 – series of emails between CF US auditor Resnick and CF US employee discussing $245,000 building purchased in Iran. Employee states "the building will be returned to Dr. Lahiji after 10 years. No official agreement is available." (Tr. Ex. 104).

•    11/6/05 – Email written by RK employee to Iranshahi summarizes "Lahiji account;" shows Oct. 2000 $250,000 "purchased a house." (Tr. Ex. 62).

---

[5] Testimony of IRS and OFAC representatives will establish that purchase of real property in Iran titled in family member's name and used for RK office for a period of years as described above is not eligible for charitable tax deduction and violates Iran embargo.

**Motion** *in Limine* **to Admit Iranian Financial Statements**                    **Page 13**

- 5/12/2006 – Email from Iranshahi to Yasrebi re: "Mr. Lahiji" with handwritten accounting of Lahiji funds which includes $200,000 "for the purpose of paying debt to buy a house." (Tr. Ex. 68).

- 11/27/2006 -- defendants fax a letter to Yasrebi and Iranshahi providing their own accounting of funds they had provided as "donations" to CF US. The accounting included reference to a $250,000 house purchased in Tehran which was "due back" in 2010. (Tr. Ex. 81).

- 2/13/08 – email from Iranshahi to defendant Lahiji stating "we are obligated to you for the following . . . items" listing *inter alia* "Office CF Tehran October 7, 2010  start (Oct. 7, 2001)." (Tr. Ex. 95).

**Bank Karafarin CD account.**  As noted above, the 2003-08 RK financial statements all note the existence of the Lahiji Karafarin account.  With the exception of the '03 statement which immediately followed the creation of the account and the '09 statement showing it zeroed out, the statements track the interest growing in the account payable to defendants.  Independent evidence corroborating the existence of a conspiracy between Yasrebi, Iranshahi, CF US, RK and defendants to defraud the IRS and OFAC by facilitating the investment account in Iran in violation of the embargo, and facilitating the claim by defendants of an improper charitable tax deduction with regard to funds deposited in that account, includes:

- 2003 – Lahijis claim $359,229 charitable deduction on 2002 Form 1040 tax return which includes  CF US receipt evidencing $350,000 payment.  (Tr. Ex. 144).

- 2004 – Lahiji 1040 tax return claims $368,238 charitable deduction for 2003, including CF US receipt evidencing another $350,000 payment.  (Tr. Ex. 145).

- 11/6/05 –  Email written by RK employee to Iranshahi summarizes "Lahiji account;" shows *inter alia* "May 2003 -- $350,000 cash (May 2008);  April 2004 -- $350,000 cash (til April 2009)." (Memo Ex. 5; Tr. Ex. 62).

- 12/29/05 – fax sent from RK by Iranshahi to "Dr. Lahiji" seeking confirmation of oral agreement to donate $67,000 of "your money currently being held by this institute." (Tr. Ex. 66).

- 9/25/06 – fax from RK to Yasrebi listing "deposit in bank paid by Mr. Lahiji [approx. $675,000]." (Tr. Ex. 70).

- 10/19 – 11/30/06 – series of phone conversations, faxes and emails between Iranshahi, Yasrebi and defendants described in greater detail in trial memo. Iranshahi seeks written approval from defendant Lahiji for his utilization of $50,000 from Lahiji account for RK expenses. Iranshahi expresses concern that Iranian auditor will write adverse audit report absent Lahiji approval. Defendant Lahiji eventually approves. (Tr. Exhs. 72, 74, 76-78, 80-85, 87).

- 11/27/06 – defendant Vahid faxes Iranshahi and Yasrebi defendants' accounting for funds provided to CF US between 1999 and 2005. In addition to the Tehran house (mentioned above), the fax refers to "$350,000 placed in a joint account for a period of 5 years (due [April 2008]);" "receipt pending for $200,000.00 khoms" paid in 2006; "please show bank statements for the joint account." (Memo Ex. 7; Tr. Ex. 81).

- 2/13/08 – internal RK email containing Iranshahi's handwritten note on 11/27/2006 fax sent by defendant Vahid (described above). Iranshahi approves Vahid's accounting. (Tr. Ex. 95).

- 2/13/08 – email from Iranshahi to defendant Lahiji stating "we are obligated to you for the following . . . items" listing *inter alia*: "Money $350,000 August 22, 2008 start in Iran. Please notify me if there is any problem with any of those items." (Memo Ex. 6; Tr. Ex. 96).

- 7/15/08 – Rule 41 criminal search warrants served on multiple locations in Oregon and Texas associated with CF US, Yasrebi and defendants.

- 5/31/2009 – 2009 RK financial statement (more fully described above) first to have been posted after investigation became overt. Karafarin Bank deposit is zeroed out and defendants essentially disappear from books of RK with no explanation. (Tr. Ex. 129).

**The audited financial statements were prepared during the course of the conspiracy.**

Each of the financial statements were created and disseminated while the conspiracy existed, prior to its termination. "[W]here a general objective of the conspiracy is money, the conspiracy does not end, of necessity, before the spoils are divided among the miscreants." *United States v. Knuckles*, 581 F.2d 305, 313 (2d Cir. 1978) (citations omitted). Here, the building in Tehran purchased for a Lahiji family member with funds defendants provided to CF US as supposed charitable donations was not "due back" until 2010, by defendants' own account. Defendants'

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 15**

funds were invested in what the conspirators themselves described as a "CD account" from 2003 – 2008. The account is described in each of the financial statements for those years. The May 31, 2009, statement documents the liquidation of the account during the preceding year. Thus, each of the financial statements between 2002 and 2009 were issued "during the course of" the conspiracy.

The indictment alleges that the conspiracy extended "until at least July 2008." Indictment, ¶ 12. Defendants may argue that the allegations in the indictment control the admissibility of evidence under Rule 801(d)(2)(E), and that the 2009 financial statement was prepared after the conspiracy had terminated. Such an argument would be in error. In determining whether a statement was made during the course of a conspiracy, the dates of the conspiracy as alleged in the indictment are not controlling. *United States v. Lyon*, 959 F.2d 701, 705 (8th Cir. 1992). It is the *evidence* of a conspiracy which determines the time at which it terminates, not the pleadings. For example, even where no conspiracy charge is included in an indictment to begin with, co-conspirator statements are admissible under Rule 801(d)(2)(E) if the requisite elements are met. *United States v. Lutz*, 621 F.2d 940, 946-47 (9th Cir. 1980) ("even though the participants in the …scheme were not charged with conspiracy, their out-of-court acts or statements, if made during and in furtherance of the scheme, were admissible against coparticipants . . . ."); *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir. 1978) ("it is not necessary for a charge of conspiracy to have been brought in order for coconspirator hearsay to become admissible").

**The audited financial statements were prepared and disseminated in furtherance of the conspiracy**. It was imperative that the parties maintain records of the transactions which are the subject of this conspiracy. "[I]n any conspiracy that involves complex financial transactions,

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 16**

it is in furtherance of the conspiracy to maintain records of those transactions." *United States v Moran*, 493 F.3d 1002, 1011 (9th Cir. 2007). "[S]tatements made to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the 'in furtherance' of requirement." *Id.* (quoting *United States v Yarbrough*, 852 F.2d 1522, 1536 (9th Cir. 1988)). And as developed more fully below, it furthered the conspiracy for there to be an audited financial statement of Refah Kudak's finances. It provided neutral accounting for the Lahiji funds. An audited statement imbued the various schemes with an air of legitimacy that might forestall serious inquiry or investigation by law enforcement or regulators. It allowed the conspiracy to continue and flourish.

Defendants may argue that they were not consulted about nor shown RK's financial statements, thus the statements could not have "furthered" the conspiracy. Any such argument would be inaccurate. "Ledgers, books of record, and notes containing information relevant to the conspiracy may be admissible against coconspirators as statements in furtherance of the conspiracy without evidence they were in fact consulted or otherwise communicated." *United States v. Schmit*, 881 F.2d 608, 613 (9th Cir. 1989) (citations omitted).

Defendants may seek to argue that the financial statements (1) have inaccuracies or arithmetic errors, and/or (2) are unreliable, and for those reasons should not be admitted. As noted in the government's trial memo, the financial statements are admittedly not perfect. However, a similar argument was flatly rejected in *Moran*, where defendants "offered evidence that the records were inaccurate, suggesting that they were intended to deceive, not inform . . . ." *Moran*, 493 F.3d at 1011. In rejecting defendants' "deceptive inaccuracies" argument and upholding the admissibility of the disputed records as coconspirator statements, the opinion holds that "alleged evidence of inaccuracies in the computer records does not affect their

**Motion *in Limine* to Admit Iranian Financial Statements**                **Page 17**

admissibility, but merely goes to their weight." *Id.* (citing *Bourjaily*, 483 U.S. at 183 ("[A] court need not independently inquire into the reliability of [coconspirator] statements.")).

**Co-conspirators Yasrebi, Iranshahi, Child Foundation U.S. and Refah Kudak commissioned the RK audited financial statements and adopted and disseminated them as their own to advance the conspiracy's goals.** Of course, a condition precedent to the admissibility of co-conspirator statements is that the statement under consideration be made by a coconspirator. While defendants' co-conspirators did not personally conduct the audits, they commissioned them and provided the auditors with the information upon which to conduct the audits.[6] Thereafter, defendants' co-conspirators adopted and embraced the audited financial statements, transmitted them between one another, tendered them to CF US' auditor, and held them out to any and all interested parties in public communications as accurate statements of financial activity highly relevant to the conspiracy. As demonstrated below, and by analogy to Federal Rule of Evidence 801(d)(2)(B) regarding adoptive admissions (or as a necessary intermediate step in the analysis), defendants' coconspirators "manifested that [they] adopted and believed [the RK financial statements] to be true." Having adopted the financial statements, defendants' coconspirators disseminated them and employed them to further the aims and goals of the conspiracy.

For example, an excerpt from the March 2006 edition (Edition No. 4) of *Hamyaran Bonyad Kudak* Magazine is attached as Memorandum Exhibit 1. (Tr. Ex. 53). *Hamyaran* serves as "[t]he internal periodical of Child Foundation, Iran under Tehran Office supervision"

---

[6] Each of the audited financial statements contains a summary opinion letter within the first few pages. Each summary essentially states that the financial statements were the responsibility of RK's management, and the responsibility of the auditor was to express an opinion on the statements. See, Mem. Exhs. 8, p. 3; 9, p. 3; 10, p. 3; 11, p. 2; 12, p. 2; 13, p. 2; 14, p. 3; 15, p. 2.

**Motion *in Limine* to Admit Iranian Financial Statements** **Page 18**

and is publicly distributed to donors and others.  Ex. 1, p. 2.  Each issue contains a Farsi and English version in the same publication.

In late March 2006, Customs and Border Patrol (CBP) personnel inspected 15 boxes arriving in Portland sent by RK in Iran addressed to Yasrebi.  Contained in the boxes were several thousand copies of the '06 edition of *Hamyaran* for distribution here in the U.S.  An excerpt of the magazine is attached as Memorandum Exhibit 1.  In an article entitled "A Mirror of Trust," the March 2006 publication devotes a full page to describing the May 31, 2005, RK audited financial statement described above.  Memo Ex. 1, p. 3.  The article contains an actual copy of the letter summary of the audit produced and signed by "Tadvin and Company, Ernst and Young International" on its letterhead.  *Id.*  The article reads in pertinent part:

> Child Foundation prints its statements of financial operations in the Hamyaran magazine every year.  This suitable action enables the generous sponsors to obtain information about the distribution of the donated funds by accessing the web site of the foundation or by directly contacting the headquarters of Child Foundation in Tehran.
>
> . . . .
>
> The audited financial report conducted by Ernst & Young for the Persian fiscal year ended in 10th of Khordad, 1384 (May 31, 2005) concludes that: 'the financial statements present fairly, in all material respects, the financial position of the Refah Koodak Charity Institute as of 31 May 2005 and the results of its operations and cash flows for the year then ended in conformity with the Accounting Standards Generally Accepted in Iran.'
>
> The confirmation of the accuracy of the financial statements leads to an increase in the sponsor's trust and confidence in the honesty and integrity of the Child Foundation's personnel in delivering funds to the needy children.

*Id.*  The article also contains a chart with segments of RK's audited financial statement as reported in the audit in rials and dollars, described as "EXPENSES OF THE 2004/2005 Fiscal Year."  *Id.*

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 19**

The documents attached as Memorandum Exhibit 2 describes the role of *Hamyaran* magazine within the organizations, and were seized pursuant to the July 2008 Rule 41 criminal search warrants.  The first page, consisting of an email regarding *Hamyaran* seized at Yasrebi's residence, had no second page or attachment when discovered.  Agents seized the second and third pages of the exhibit separately, at CF US's offices.  As Memorandum Exhibit 2 shows, *Hamyaran* served as a primary method of communication between RK and CF US and their donors and sponsors.  The magazine claims to have had a worldwide circulation of over 8,000.  Although it did not have a regular publication schedule, the magazine sold advertising and was widely distributed.

The February 2008 edition (Edition No. 5) of *Hamyaran*, an excerpt of which is attached as Memorandum Exhibit 3, contained a full-page article entitled "Child Foundation's Reputation for Good Standing Continues."  (Memo Ex. 3, p. 3).  The article features a photo of what appears to be a leather-bound copy of the audited RK financial statement for the fiscal year ending May 31, 2007, and several summary charts.  *Id.*  In pertinent part, the article reads:

> In the last fiscal year, as like the previous ones, Child Foundation's cash flows and deposit accounts have been audited by "Armoon Gostaran Pishgam" auditory (sic) institute**.  *The reports on the accomplished auditory (sic) have been launched on Child Foundation's website.  These reports are also ready at Child Foundation's main office in Tehran to be presented to the persons who are interested in our financial statements.*  The report concludes: "the financial position of the Refah Kudak Charity Institute as of 31 May 2007 and the results of its operations and cash flows for the year then ended in conformity with the accounting standards generally accepted in Iran."

*Id.*  (emphasis added).  Agents recovered copies of Exhibit 4 during the service of the July 2008 Rule 41 criminal search warrants at CF US' office and at Yasrebi's residence.

The March 2009 edition (Edition No. 6) of *Hamyaran* (excerpt attached as Memorandum Exhibit 4) contains a similar article entitled "Acquiring Trust a Weighty Yet Indispensible

**Motion *in Limine* to Admit Iranian Financial Statements                              Page 20**

Obligation." Ex. 4, p. 3. The article touts the May 31, 2008, audited financial statement and is accompanied by a chart and photo similar to those contained in Exhibit 3. CBP personnel discovered the March 2009 edition of *Hamyaran* as a part of a border search of an incoming shipment sent from RK addressed to Child Foundation in Portland in May 2009. The shipment consisted of five boxes weighing 280 kilos and contained thousands of copies of the publication presumably for distribution in the U.S.

As noted above, CF US auditor Jon Resnick will testify that in December 2005 Yasrebi provided him with a copy of the May 31, 2005, RK audited financial statement in connection with the audit of CF US that Mr. Resnick was then conducting. Mr. Resnick will testify that he sought a copy of the audit – and Yasrebi provided it -- to help satisfy himself that donated funds were actually reaching the intended recipients. Mr. Resnick will testify that he ultimately provided CF US with an audit report that did not contain major exceptions. The RK statements were a material component of that process.

Co-defendant Iranshahi, RK, Yasrebi and CF US adopted and held out to all interested parties – indeed, held out to the world on RK's website – RK's audited financial statements during the relevant time period. As developed above, the audited statements served the conspiracy by providing neutral accounting for the Lahiji Karafarin account. They helped perpetuate the tax-exempt infrastructure of CF US – a necessary ingredient to the conspiracy – by reducing the chances of serious inquiry by authorities due to the "clean" audit. And the statements were used as a tool by defendants' coconspirators to draw ever larger numbers of donors, indirectly benefitting the Lahijis by providing growing revenues within which the Lahijis' funds could be commingled and go unnoticed.

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 21**

Defendants may argue that the RK financial statements were prepared by outside auditors, not parties to the conspiracy, and accordingly are not statements of co-conspirators as required by Rule 801(d)(2)(E).   But this is not a case involving passive adoption, or adoption by silence.  When defendants' coconspirators disseminated the financial statements as described, providing one to CF US's outside auditor, sending them back and forth to one another, displaying them on their website, offering to provide them to anyone on demand (in Tehran) as evidence of their trustworthiness, relying on them for fund raising, and relying on them to project a "clean" image to evade notice by regulators, the audited statements were in fact *"owned"* by the co-conspirators.

To illustrate, assume hypothetically that "A" and "B" are partners in a *Ponzi* scheme. The scheme needs additional investors to stay afloat.  Unbeknownst to "A," "B" sends an email to potential investors in an attempt to raise funds.  Attached to the email are letters from the earliest investors, extolling the scheme and attesting honestly that "A" and "B" delivered as promised (but, as it turns out, with later investors' funds).   Assume that "A" is tried alone.

"A" argues that the letters of the non-conspirator third parties are inadmissible under 801(d)(2)(E) because the earlier investors were not co-conspirators, as required.  According to "A," although "B" may have adopted the letters, their admissibility is confined to the adopting party under 801(d)(2)(B) (adoptive admissions).  Since *he* did not adopt them, "A" argues that they are inadmissible against him.

The position of the United States is that by both adopting *and* taking the next step to actively employ the early investors' testimonials, they become an integral part of the statement of co-conspirator "B."   "B" *owns* the statements and uses them in an attempt to ensure the conspiracy prospers.  When a conspirator adopts, extolls and actually employs a non-

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 22**

conspirator's statement to further a conspiracy, the statement is admissible against all members under 801(d)(2)(E).  By contrast, silent acquiescence to or mere agreement with a non-conspirator's statement is admissible against only the adopting party under Rule 801(d)(2)(B).

Defendants may also argue that the facts here are analogous to those in *United States v. Ordonez*, 722 F.2d 530 (9th Cir.1983), *reh'g denied*, 737 F.2d 792 (9th Cir.1984), a case distinguishable on its facts.  *Ordonez* held that entries in a drug ledger constitute inadmissible hearsay when the government cannot establish that they were authored by a conspirator.  *Id.* at 534–36.  *See also United States v. Mouzin*, 785 F.2d 682, 692-93 (mere possession of a ledger or writing, standing alone, does not establish that the person in possession has adopted it).

Here, of course, the audited financial statements were commissioned by, expressly adopted by and communicated with approval by defendants' co-conspirators in the course of and in furtherance of the conspiracy.  Our facts are more analogous to those in *United States v. Valles-Valencia*, 811 F.2d 1232, (9th Cir. 1987) (drug ledgers which contained dates that fell within the span of the charged conspiracy written by a conspirator were admissible against co-conspirators as statements made during and in furtherance of a conspiracy).  *See also United States v. Singleton*, 125 F.3d 1097, 1106-07 (7th Cir. 1997) (evidence that conspirator "A" referred non-conspirator to co-conspirators "B" and "C" for purchase of drugs and agreed with incriminating historical statements by non-conspirator about "B" and "C" were admissible against "B" and "C" as co-conspirator statements under Rule 801(d)(2)(E)).  Here, defendants' co-conspirators expressly employed – *i.e.* communicated further -- the audited financial statements in an effort to benefit all members.

**Alternatively, the audited financial statements are admissible under Fed. R. Evid. 807, the residual exception.**  Should the court decline to admit any or all of the Refah Kudak

**Motion *in Limine* to Admit Iranian Financial Statements**                                    **Page 23**

audited financial statements described above, Federal Evidence Rule 807 applies.  Rule 807

provides:

(a) In General. Under the following circumstances, a hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804:

(1) the statement has equivalent circumstantial guarantees of trustworthiness;

(2) it is offered as evidence of a material fact;

(3) it is more probative on the point for which it is offered than any other evidence

that the proponent can obtain through reasonable efforts; and

(4) admitting it will best serve the purposes of these rules and the interests of justice.

(b) Notice. The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it.

Rule 807 applies to "out-of-court statements that contain strong circumstantial indicia of reliability, that are highly probative on the material questions at trial, and that are better than other evidence otherwise available." *Tome v. United States*, 513 U.S. 130, 166 (1995).  The United States readily acknowledges that Rule 807 is narrowly construed "to prevent it from becoming the exception that swallows the hearsay rule." *United States v. Lawrence*, 405 F.3d 888 (10th Cir. 2005).   The proponent has a "heavy burden" of establishing that the statement meets the requirement of the rule, specifically that the evidence is:

• Supported by "circumstantial guarantees of trustworthiness" equivalent to "firmly rooted" exceptions.

• Offered as evidence of a material fact.

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 24**

- More probative on the point for which it is offered than any other available and admissible evidence.

- Fulfills the purposes of the evidence rules and the interests of justice.

*United States v. Smith*, 591 F.3d 974, 980 (8th Cir. 2010) (DVD of forensic interview of a child sex crime victim properly admitted); *United States v. McCraney*, 612 F.3d 1057, 1061-62 (10th Cir. 2010) (out of court statement by the defendant that he was an unwitting participant in the crime was inadmissible because it was not trustworthy).

The audited RK financial statements satisfy the "circumstantial guarantees of trustworthiness" requirement of Rule 807(a)(1). The charities and conspirators involved all relied on the records during the conspiracy. The records were deemed "trustworthy" when it suited the parties.

The RK audited financial statements mirror other categories of evidence. This corroboration provides additional indicia of trustworthiness, at least as to the accounting for the Lahiji funds. For example, independently-generated US financial records showing defendants' donations of $350,000 in 2003 and 2004 generally match the amounts appearing in the Karafarin account and discussed in the audits for those years. Internal email communications among RK employees accounting for the Lahiji funds correspond with the RK financial statements. Examples of the emails are described above and are appended here as Memorandum Exhibits 5 and 6. The figures in the financial statements are also generally consistent with receipts issued to defendants by CF US, and with defendants' tax returns wherein they deducted the funds they supplied to CF US that eventually appear in the Karafarin account.

The statements are entirely consistent with the series of communications between the parties in October and November 2006, during which coconspirators Iranshahi and Yasrebi

**Motion *in Limine* to Admit Iranian Financial Statements**          **Page 25**

sought after-the-fact approval from defendant Lahiji for having taken $50,000 from "your account." During one telephone conversation on 11/27/2007, Yasrebi described the Karafarin account to a "Tee:" "You made contract with Dr. Lahiji and Mr. Iranshahi, that is why the money must be in a CD account. . . . the money was not supposed to be touched." And perhaps most importantly, the financial statements are consistent with defendants' *own* accounting for the funds, as evidenced by the 11/27/2006 fax described above sent by defendant Vahid to conspirators Yasrebi and Iranshahi. See faxed accounting by defendant Vahid attached as Memorandum Exhibit 7.

The statements will be offered to prove material facts central to the indictment, as required by Rule 807(a)(2). They are extremely probative as contemplated by Rule 807(a)(3), in that they lay out the financial relationship between the conspirators in comprehensive fashion. For example, no other documentary evidence establishes that RK characterized both the principal and interest of the Karafarin account as *liabilities* for a period of time.

Admitting the financial statements into evidence under Rule 807 serves the best interest of justice because the defendants chose to conduct business in a country subject to embargo during all material times. Iran is a nation with which the US has no diplomatic relations and no Mutual Legal Assistance Treaties. There are no forms of process – not even "Letters Rogatory" -- that might realistically be expected to enable the United States to acquire evidence or interview witnesses on site. This obviously hampers our ability to provide certifications and witnesses. It would be unjust for defendants to benefit as a result.

The facts in this case are not unlike those in *United States v. Dumeisi*, 424 F.3d 566, 575-77 (7th Cir. 2005). There, the district court admitted an Iraqi Intelligence Service (IIS) file acquired in Baghdad during the trial of defendant, who was charged with being an unregistered

**Motion *in Limine* to Admit Iranian Financial Statements**                    **Page 26**

agent of Iraq supporting the Saddam Hossein regime before the gulf war. Defendant was accused of reporting to the IIS on the activities of opposition groups in the United States. The IIS file was obtained by an American counterintelligence officer (who testified at trial) from a member of the opposition in Baghdad (who did not testify). The latter apparently found it in Baghdad in the aftermath of the fall of Hossein while seeking files to exploit in the quest to find weapons of mass destruction in Iraq. The "Baghdad file" was highly incriminating, characterized by the defendant as "'the single most important piece of government evidence,' but . . . [nothing more than] unauthenticated hearsay." *Id.* 424 F.3d at 574.

In upholding the admissibility of the "Baghdad file" under the "residual exception" provided by Rule 807, the opinion first noted that "trial courts have a considerable measure of discretion in deciding when a hearsay statement fits the residual exception." *Id.* The opinion was fortified by the fact that the district court considered "the same circumstantial guarantees of trustworthiness that justify admission of business records and official records without violating the Confrontation Clause." *Id.* 424 F.3d at 576. "For example, the court relied upon . . . testimony that IIS officers had a duty to accurately record their own activities and the information received from their sources," *id.*, just as Iranian CPAs have a duty to accurately conduct audits complying with professional standards as evidenced by the summary opinion letters appended to each of the audits.[7] "The lack of a motive to falsify information and the fact that written records are often more reliable than the potentially hazy memory of the recorder are the classic reasons for excepting business records and official records from the hearsay rule-in other words, for making them firmly rooted hearsay exceptions." *Id.* at 577 (citations omitted). Here, much like the circumstances in *Dumeisi*, it would be a stretch to argue that the accounting

---

[7] Each of the audited statements contains a statement essentially stating that the financial statements conform to generally accepted accounting principles.

**Motion *in Limine* to Admit Iranian Financial Statements**                **Page 27**

firms that conducted the audits had a motive to misrepresent the status of defendants' accounts with RK.  And written records are generally more accurate than witness' memories.  In short, the RK audited financial statements contain many of the same "circumstantial guarantees of trustworthiness" found in "firmly-rooted" hearsay exceptions that justified the admission of the IIS records in *Dumeisi*.  They should be admitted under Rule 807.

Dated this 29th day of April 2013.

Respectfully submitted,

S. AMANDA MARSHALL
United States Attorney

s/ *David L. Atkinson*
**DAVID L. ATKINSON, OSB #75021**
Assistant United States Attorney
(503) 727-1000

s/ *Charles F. Gorder, Jr.*
**CHARLES F. GORDER, JR., OSB #91287**
Assistant United States Attorney
(503) 727-1000